# EXHIBIT G

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------------X
ANDREA LISSETH ARMIJOS ABAD,

         Plaintiff,

   -against-

620 W 153 REALTY LLC and ON STAR MANAGEMENT
LLC,

         Defendants.
-----------------------------------------------------------------------X
620 W 153 REALTY LLC and ON STAR MANAGEMENT
LLC,

         Third-Party Plaintiffs,

   -against-

BATCO ASSOCIATES LLC, GRD SAFETY INC.,
and CMG IMPROVEMENTS, INC.,

         Third-Party Defendants.
-----------------------------------------------------------------------X

**Index No.:** 520767/2022

**VERIFIED BILL OF
PARTICULARS**

    **PLEASE TAKE NOTICE** that the Plaintiff ANDREA LISSETH ARMIJOS ABAD, by his

attorney WILLIAM SCHWITZER & ASSOCIATES, P.C., hereby allege the following as for a

Verified Bill of Particulars as to the Third-Party Defendant CMG IMPROVEMENTS, INC. upon

information and belief:

    1.   Plaintiff objects to Defendant's demand to state Plaintiff's prior addresses for the

past three years, gender, social security number, Medicare health insurance claim number and N.Y.

State M.V. license ID number as improper, evidentiary in nature and beyond the scope of a bill of

Particulars. However, without waiving this objection, Plaintiff's current address is 98-42 Alystne

Avenue, Flushing, New York 11368.

    2.   The accident occurred on July 15, 2022 at approximately 11:30 A.M.

**SMG00159**

3.      The subject accident occurred at 620 West 153rd Street, County, City and State of New York, more specifically on the 7th floor of the subject premises.

4.      Plaintiff objects to Defendant's demand to describe the nature of the defective condition which resulted in the Plaintiff's accident as improper, evidentiary in nature and beyond the scope of a Bill of Particulars.

5.      Defendants were negligent and/or violated the Labor law as follows:

- In failing and neglecting to provide plaintiff with a safe ladder;

- In failing to furnish, erect and/or construct a safe ladder;

- In failing to maintain the subject ladder in a safe manner;

- In failing and omitting to furnish, erect, construct, place, and/or operate a ladder so as to provide the plaintiff with proper protection;

- In allowing plaintiff to perform work on an unsafe, dangerous, defective, ladder;

- In failing to provide plaintiff with additional help or otherwise secure the ladder;

- In failing to properly secure and/or barricade the area around the ladder to protect against accidental contact;

- In failing to provide proper shoring, bracing, and/or sheeting;

- In failing and neglecting to provide plaintiff with a secured ladder, which was not chocked or wedged in place or tied off or secured in any way;

- In causing, permitting and allowing a dangerous, hazardous, and defective ladder to be used at the aforesaid site;

- In failing to inspect and/or repair said ladder;

- In failing and omitting to adequately and properly maintain said ladder;

- In failing to provide an adequate safety device to protect the plaintiff from falling from a height;

SMG00160

- In failing and neglecting to provide scaffold allowing plaintiff to perform work;

- In failing and neglecting to provide harness, lanyards, hoists and other protective devices;

- In failing to provide proper footing or even surface for subject ladder;

- In failing to protect plaintiff from height related risks;

- In failing to provide plaintiff with adequate safety devices;

- In providing the plaintiff herein with a dangerous ladder for use in the services he was performing;

- In failing and neglecting to provide plaintiff with an appropriate ladder or other device to be utilized in the work, labor and services they were or other device performing;

- In failing and neglecting to supervise, inspect, evaluate and observe the materials, equipment and supplies workers use in the course of work in progress;

- In failing and neglecting to properly instruct and supervise workers, and more particularly plaintiff, upon the work site in the usual necessary, proper and required safety measures and procedures;

- In failing and neglecting to engage and employ experienced, trained and required engineering design and safety officials;

- In failing, neglecting and omitting to provide safety devices, safety belts or equivalent devices for proper protection and to guard against and eliminate the hazard of falling;

- In failing to remove said dangerous condition and take other steps necessary to remedy said dangerous condition;

- In failing to take all necessary steps, actions and precautions to prevent the occurrence;

- In failing to exercise the care, caution and judgment required of the defendants under all the circumstances that exist at the time of the occurrence and prior thereto;

SMG00161

- In failing and neglecting to inspect the work site and ladder in that defendant knew or should have known that said dangerous condition existed for a long and unreasonable period of time, and in doing nothing to repair the same;

- In causing, suffering and permitting users of said ladder and more particularly the above-named plaintiff to use said ladder while it was in a dangerous and defective condition;

- In negligently and carelessly suffering and permitting the aforesaid dangerous and defective ladder to be, become and remain for an unreasonable period of time after the defendant had, or in the exercise of due and reasonable care, should have had, due notice thereof;

- Plaintiff will also rely on the doctrine of *res ipsa loquitor*.

6.- 8.    Actual notice is claimed, in that the Defendants, their agents, servants, contractors and employees caused, permitted, allowed and/or created said dangerous and hazardous condition. The Defendants in the exercise of due and reasonable care should have known of the dangerous and defective condition. Also, upon information and belief, it will be claimed that the Defendants, their agents, servants, contractors and employees caused, contributed and/or created the dangerous and hazardous condition as aforesaid and had determined the existence of the dangerous and hazardous conditions and observed same prior to directing the Plaintiff to work in the subject area. Additionally, actual notice and prior written notice is not a pre-requisite to Plaintiff's Labor Law claims.

Constructive notice is claimed, in that the Defendants, their agents, servants, contractors and employees caused, permitted and allowed said dangerous and hazardous condition to be, become and remain at the subject premises for such a lengthy period of time prior to this accident that the Defendants knew or in the exercise of due and reasonable care should have known to be then and there existing and remedy same. Additionally, constructive notice is not a pre-requisite to Plaintiff's Labor Law claims.

SMG00162

9. – 10. As a result of the Defendant's negligence and/or Labor Law violations, the plaintiff was caused to suffer the following injuries:

**LUMBAR SPINE**

- L5-S1 annular tear and herniation;

**As a result of the foregoing, Plaintiff was required to undergo the following procedure on October 24, 2022 by Dr. Scott S. Katzman at Mountain Surgery Center:**

**PROCEDURE:**

1.      Right-sided laminectomy, foraminotomy, complete facetectomy, discectomy, L5-S1.
2.      Transforaminal lumbar interbody fusion, L5-S1.
3.      Pedicle screws two vertebral body segments.
4.      Use of autograft bone.
5.      Insertion of biomechanical device.
6.      Use of operative microscope.

**DESCRIPTION OF PROCEDURE:** The patient was taken to the operating room, placed in the prone position. After undergoing general anesthesia, was sterilely prepped and draped. An incision was made to the right of midline. The patient has right leg numbness, tingling, and weakness, and back pain. Plan is for surgical correction with the patient failed conservative treatment. Sterile prep and drape was performed. Time-out was obtained and an incision was made to the right at midline. It was made through skin and subcutaneous tissue. Fascia was splint, muscle was splint, and limina was exposed. A microscope was brought in retractors were applied and the lamina was exposed. The high-speed bur was used to start the laminectomy. This was then widened with a #2 Kerrison and then #3 Kerrison. A hemilaminectomy was done right-sided at L5-S1, partial facetectomy, and a foraminotomy. I came down expose the nerve root retracted it medialward then did discectomy. There was a herniated disc, which impinged the nerve root. The patient had the nerve root retracted out of harm's way; discectomy was done completely. I started to use manual shavers and putting the end shavers into the disc space at the L5-S1 level. I continued cleaning out disc using a pituitary rongeur and using end cutters and then Kerrison rongeurs. I sized the implant to a size 11 height. There was already a collapse at the disc space pretty significantly severe foraminal stenosis, but a combination of majority was from the herniated disc. There was some thickened ligamentum flavum I removed. I did a hemilaminectomy, I did foraminotomy, and then I did a complete discectomy. I tapped in the cage sizing it to a size 11, placed into position opening up the foramen and probed the nerve root and noted it was freed. The cage was a Life Science interbody cage 11 mm height, 9 mm width 26 mm length. I then locked it into position with two screws 6.5 x 40 and 6.5 x

SMG00163

35. I put plenty of bone graft in front of the cage, around the cage, and in the cage itself. Everything was locked down. Wounds are copiously irrigated and closed in a multilayered fashion. The patient had a laminectomy, foraminotomy, and fusion right-sided at L5-S1. Pedicle screws were placed at two vertebral body segments L5 and S1. The interbody cage was locked in position. The implants used was the HD Life Science interbody cage and the screws were Republic Dark Star Pedicle Screws. No complications occurred.  SSEP monitoring noted the screws to be above 20 mm and were tested and there was no complication. The patient tolerated the procedure well. Bleeding was kept to a minimal. There is minimal blood loss and was recorded negligible. No complications occurred. Sponge and needle counts were correct. Wounds were copiously irrigated and the patient was closed in a usual sterile fashion.

**As a result of the foregoing, Plaintiff was required to undergo the following procedure on August 15, 2022 by Dr. Joseph Kim:**

**PROCEDURE:** L5-S1 Interlaminar Epidural Steroid Injection.

**DESCRIPTION OF PROCEDURE:** the above noted patient has been seen and has a positive history and/or physical/imaging exam. The above noted diagnoses have been established and the patient has failed basic non-invasive conservative treatment. The different options both non-surgical/surgical and risks benefits have been explained in simple laymen's terms to the patient/family including complications such as bleeding, allergic reaction, infection and other complications up to and including death. Informed consent was obtained after the risks, benefits, and alternatives explained to the patient. Patient was brought to the procedure room and placed in the prone position. Standard ASA monitors were then applied. Confirmation of the procedure was obtained from the patient. The skin overlying the area to be injected was cleaned in a sterile fashion using betadine. Sterile drape was placed around the area to be injected. The overlying skin was anesthetized with 1 % Lidocaine using 25G 5/8" needle. The level to be accessed was identified under fluoroscopy. An 20g Tuohy needle advanced under fluoroscopic guidance into the epidural space. Epidural space identified by positive loss of resistance, and confirmed with lateral view. Intravascular and intrathecal injection was excluded. There were no paresthesias during the needle placement. After negative aspiration non-ionic contrast, Omnipaque 180 was injected revealing epidural spread. After negative aspiration, a 5cc mixture of 2cc of 1% lidocaine MPF, 2cc sterile NS and 80mg`s (1cc) of DepoMedrol injected at the level mentioned. The needle was then withdrawn, flushed with NS and then removed.

The patient tolerated procedure well. A&Ox3, VSS, discharged in good & stable condition.

- Radiculopathy;

SMG00164

- Internal derangement;

- Sprain/strain;

- Severe pain, swelling, and tenderness;

- Loss of strength;

- Restricted range of motion;

- Adjacent segment degeneration;

- Post traumatic arthritis;

- Post-surgical scaring;

- Need for future surgery;

As a result of the foregoing Plaintiff suffers from severe pain, swelling and tenderness of the lumbar spine resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability, and adjacent segment degeneration.

### CERVICAL SPINE

- C4-5 herniation and bulge;

- C5-6 herniation and bulge;

- C6-7 bulge;

**As a result of the foregoing, Plaintiff was required to undergo the following procedure on September 18, 2023, by Dr. Scott S. Katzman, at Mountain Surgery Center**

### POSTOPERATIVE DIAGNOSES:

1. Herniated disc at C5-C6
2. C5-C6 radiculopathy
3. Weakness to the biceps and triceps area bilaterally, right greater than left
4. Smallest herniated disc at C4-C5
5. Nerve root impingement, spinal cord compression noted at the C5-C6
6. Neck pain and headache with radiculopathy
7. Advancing neurological weakness
8. Extruded herniated disc fragment, right-sided at C5-C6.

SMG00165

**OPERATIVE PROCEDURE:**

Incision was made anteriorly in the neck and then the level of C5-C6 was identified. It was made through skin and subcutaneous tissue putting platysma and sternocleidomastoid coming down directly onto the annulus and bone. The vertebral bodies of 5-mm and 6-mm were identified, x-rays were taken to confirm the bodies of C5 and C6. A distraction pin was then placed at C5 and at C6. Distraction was done across the joint because the disc had actually collapsed a little bit and there was a herniated disc posteriorly. I opened up the disc space, removed the herniated disc but the most of it was posteriorly. I went out to the posterior longitudinal ligament. I removed the anterior annulus of most of ligament and then removed the posterior longitudinal ligament and exposed the dura. The cord was identified. There was a significant free fragment and this was removed more so on the right side. It gave foraminal stenosis. I did foraminotomies bilaterally. I used a #2 Kerrison. I opened the foramen, freed them up. I probed it with a small probe to prove that they are free. Small epidural vessels were cauterized the bipolar cautery. I was using a l0-power microscope to do the procedure. Once I completed the discectomy, I proceeded with the endplate, getting it down the bleeding bone using a high-speed burr and a curette and Kerrison rongeurs. I smoothed it out and sized it to a convex cage that was going to be a Blackhawk titanium cage that was sized 14 x 12 convex 6-mm height. I tapped the trial in position. It fit nice. I filled the bone with bone graft using autograft and allograft bone and then tapped it into position. I inserted a biomechanical device. I fused the C5-C6 segment. I then used anterior instrumentation and locked it into position. It was solidly fixed. I took x-rays to confirming proper positioning. No complications occurred. SSEP monitoring was used throughout the procedure and noted to be within normal limits. The SSEP monitoring was within normal limits and no complications occurred throughout the procedure and the patient was taken to the recovery room neurologically intact. Wounds were copiously irrigated. No significant bleeding was encountered, so no drain was utilized. It was dry and we closed everything up in a multilayered fashion. The patient tolerated the procedure well. Sponge and needle counts remained correct. Wounds were copiously irrigated and the patient was taken to the recovery room in good condition.

As a result of the foregoing, Plaintiff was required to undergo the following procedure on November 10, 2022 by Dr. Joseph Kim:

**PROCEDURE:** Cervical Trigger Point Injection.

**DESCRIPTION OF PROCEDURE:** The patient has been seen and has a positive history and physical exam. The above noted diagnoses have been established and the patient has failed basic non-invasive conservative treatment (rest, medications and physical therapy). The different options both non-surgical/surgical and risks benefits have been explained in simple laymen's terms to the patient/family including complications such as bleeding, allergic reaction, infection and other complications up to and including death. Informed

consent was obtained after the risks, benefits, and alternatives explained to the patient. The tenderness along the muscle was identified and localized. The skin overlying the area to be injected was cleaned in a sterile fashion using alcohol. We tried to target the trigger points by palpation but were not able to. We then used US guidance to place the needle. A 25G 1 ½ inch hypodermic needle was advanced into the target trigger points. After negative aspiration, a total of 10ml 1% Lidocaine. The needle was then withdrawn. Patient tolerated procedure well and was discharged home in stable condition. Complications: None.  Areas injected: bilateral trapezius, rhomboid, levator scapulae and supraspinatus muscles.  Injections were immediately followed by vapo-coolant spray and stretch, ischemic pressure massage (myotherapy).  The range of motion increased and the pain decreased more than 70% immediately after the injections.

- Radiculopathy;

- Internal derangement;

- Sprain/strain;

- Severe pain, swelling, and tenderness;

- Loss of strength;

- Restricted range of motion;

- Adjacent segment degeneration;

- Post traumatic arthritis;

- Need for future surgery;

As a result of the foregoing Plaintiff suffers from severe pain, swelling and tenderness of the cervical spine resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability, and adjacent segment degeneration.

### **RIGHT SHOULDER**

- Inferior labrum tear;

**As a result of the foregoing, Plaintiff was required to undergo the following procedure on December 11, 2023 by Steven J. Touliopoulos, M.D., at Surgicare of Manhattan**

SMG00167

**PREOPERATIVE DIAGNOSES**: Post-traumatic right shoulder anterior instability with anteroinferior labral tearing, subacromial impingement syndrome, and rule out further right shoulder internal derangement.

**POSTOPERATIVE DIAGNOSES**: Post-traumatic right shoulder anterior instability with anteroinferior labral tearing, type I SLAP lesion, and subacromial impingement syndrome.

**OPERATIVE PROCEDURE:** The patient was taken to the operating room where she was positioned supine upon the operating room table. All bony prominences were well padded. The patient received two grams of intravenous Ancef as prophylactic antibiotic treatment. The anesthesiology team administered general anesthesia. The right shoulder was then examined under anesthesia. There was gross and significant anterior shoulder instability upon stress testing under anesthesia. There was no evidence of any significant posterior shoulder instability. There were no significant mechanical restrictions to shoulder motion when examined under anesthesia. The patient was repositioned into the beach chair position. Again, all bony prominences were well padded. The right shoulder and upper extremity were prepped and free draped in the usual sterile fashion. The glenohumeral joint space was then injected with 30 cc of normal saline employing a spinal needle. A standard posterior arthroscopic portal was created with a scalpel blade and blunt trocar through which an arthroscopic camera was inserted into the glenohumeral joint space. Under arthroscopic guidance and employing a spinal needle to assist in portal placement, two separate anterior arthroscopic portals were created in a similar fashion through which two disposable 7 mm cannulas were inserted into the glenohumeral joint space. An arthroscopic probe was inserted through one of the anterior portals to aid in the examination of the glenohumeral joint space. The articular surfaces of the humeral head and glenoid were examined and probed. Areas of grade 1 to grade 2 chondral changes were noted along the glenohumeral articular surfaces. The anterior glenoid labrum was examined and probed. Superficial tearing was noted involving the anteroinferior labrum. The anteroinferior labral injury was debrided employing an arthroscopic suction shaver and arthroscopic ablator until all injured anteroinferior labral tissues were removed and the anteroinferior labral remnant was smoothed of all irregularities. The anteroinferior labral remnant was reexamined and probed following its debridement. The anteroinferior labral remnant had a preserved rim attachment to the anteroinferior glenoid. There was no evidence of any unstable Bankart lesions. The posterior glenoid labrum was inspected and probed. The posterior labrum was found to be intact, with intact and secure peripheral attachment. There was no evidence of a reverse Bankart lesion. The superior labrum was inspected and probed. A type I SLAP lesion was noted involving the superior labrum. The patient was indicated for an arthroscopic debridement of this superior labral injury which was carried out employing an arthroscopic suction shaver and arthroscopic ablator until all torn and dysfunctional superior labral tissues were removed and the remaining superior

SMG00168

labral remnant was smoothed of all irregularities. The superior labrum was re-inspected and probed following the debridement of the type I SLAP lesion. No further superior labral pathology was noted. The superior labral remnant was found to be stable upon probing and range of motion testing of the shoulder. A sublabral recess was noted. The biceps tendon was found to have a secure and stable anchor onto the superior glenoid. The biceps tendon was followed into the bicipital groove – no significant abnormalities were noted in the biceps tendon. Next, the undersurfaces of the subscapularis, supraspinatus, and infraspinatus tendons were examined, probed, and found to be intact and within normal limits. The subscapularis recess, inferior pouch, and anterior and posterior capsular regions of the shoulder were the examined and probed. There were no intraarticular loose bodies. There was no evidence of any significant intra-articular synovitis. The glenohumeral ligament complex was examined and probed. It was found to be in continuity with no signs of HAGL lesion. However, significant anterior capsular laxity and capsular redundancy with an abnormally enlarged anterior capsule volume were noted. The arthroscopic drive-through test was positive. Stress testing of the shoulder under direct arthroscopic visualization revealed gross and significant anterior shoulder instability and subluxation, consistent with preoperative diagnosis of shoulder instability. The patient was indicated for arthroscopic shoulder stabilization via anterior capsulorrhaphy. This was carried out employing a suture passer and #2 Force Fiber suture material. Standard arthroscopic suture passing and knot-tying techniques were carried out until capsular volume was reduced to normal size and there was appropriate anterior and posterior soft issue balancing obtained. At this point, the arthroscopic drive-through test was negative. There were no longer any signs of shoulder instability in any plane of motion upon stress testing under direct arthroscopic visualization. The shoulder was taken through range of motion testing. The above repairs were found to be quite stable. In addition, there was excellent range of motion in all planes of motion. The rotator cuff interval was examined and probed and found to be within normal limits. At this point, the glenohumeral joint space was irrigated and drained. The arthroscopic instrumentation was removed and repositioned into the subacromial space. A standard lateral arthroscopic portal was created with a scalpel blade and blunt trocar through which an arthroscopic shaver was placed into the subacromial space. Examination of the subacromial space revealed evidence of both bony and soft tissue impingement with hypertrophic and hyperemic subacromial and subdeltoid bursitis as well as an anterior subacromial bony prominence. The patient was indicated for an arthroscopic subacromial decompression. First, a standard subacromial and subdeltoid bursectomy was carried out employing the arthroscopic shaver. Strict hemostasis was maintained via electrocautery. Next, release of the coracoacromial ligament from its acromial insertion was carried out employing electrocautery, again with hemostasis. Finally, a standard acromioplasty was performed employing an arthroscopic bur. Following the arthroscopic subacromial decompression, the subacromial space was reexamined and reassessed. There was no longer any evidence of either bony or soft tissue

SMG00169

impingement with range of motion testing of the shoulder. There was no evidence of an unstable os acromiale, the acromioclavicular joint was examined and probed. evidence of an unstable os acromiale, the acromioclavicular joint was examined and probed. There was no evidence of any significant degenerative joint disease involving the acromioclavicular joint space (neither did the patient have any significant point tenderness in the region of the acromioclavicular joint preoperatively). The rotator cuff tendons were then inspected and probed this time from their bursal side. The bursal surface of the rotator cuff tendons was found to be intact and within normal limits. Again, there was no longer any evidence of subacromial impingement syndrome following the arthroscopic subacromial decompression. The subacromial space was then thoroughly irrigated and drained. The arthroscopic instrumentation was removed. The arthroscopic portal tracts were irrigated with normal saline and closed employing interrupted 3-0 nylon sutures. The shoulder was re-examined under anesthesia. There was excellent range of motion in all planes of motion. There was no crepitus. There were no signs of shoulder instability in any plane of motion. A sterile dressing was applied to the right shoulder. The right upper extremity was placed in a shoulder sling. The patient was then transferred to a stretcher and escorted to the recovery room in stable condition having tolerated the procedure well.

- Internal derangement;

- Edema

- Joint effusion;

- Sprain and strain;

- Impingement;

- Spasms;

- Synovitis;

- Post traumatic arthritis;

- Severe pain, swelling and tenderness;

- Marked restriction in range of motion;

- Numbness, tenderness and tingling;

- Need for injections; and

- Need for additional future surgery.

As a result of the foregoing Plaintiff suffers from severe pain, swelling and tenderness of the right shoulder resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

**RIGHT KNEE**

- Anterior cruciate ligament tear;

**As a result of the foregoing, Plaintiff was required to undergo the following procedure on June 2, 2023, by Dr. Steven Touliopoulos at Mount Sinai Of Queens:**

**Preoperative Diagnosis**: Post traumatic right knee anterior cruciate ligament insufficiency and rule out further right knee internal knee derangement.

**Postoperative Diagnosis**: Post traumatic right knee anterior cruciate ligament insufficiency.

**Operation**: Right knee diagnostic arthroscopy and arthroscopic assisted anterior cruciate ligament reconstruction employing patella tendon autograft.

**Operative Procedure**: The patient was taken to the operating room where she was positioned supine on the operating room table with all bony prominences well padded. Ancef (2 grams) was infused as prophylactic antibiotic treatment. The patient underwent general anesthesia via endotracheal tube intubation, which was administered by the anesthesiology team. The right knee was then examined under anesthesia. The patient had full knee extension. An effusion somewhat limited knee flexion. There was no varus or valgus instability. The Lachman, anterior drawer, and pivot shift tests were grossly positive. The calves were soft bilaterally. Patellofemoral tracking was within normal limits. There was normal medial and lateral patellar translation. There was atrophy of the right thigh. At this point, tourniquet cuff was placed around the upper thigh of the operative extremity and the thigh was then placed into a knee holder. The lower extremity was the prepped and draped in the usual sterile fashion. The lower extremity was then exsanguinated with an esmarch bandage and then the tourniquet cuff was inflated. A standard anterolateral arthroscopic portal was created employing a scalpel blade and blunt trocar through which an arthroscopic camera was inserted into the medial compartment. Under arthroscopic guidance and employing a spinal needle to assist in the portal placement, a standard anteromedial portal was created in a similar fashion through which an arthroscopic probe was placed into the medial compartment. The medial meniscus was examined and probed. The medial meniscus was found to be intact and within normal limits. There were no medial meniscal tears noted. The medial meniscus had an intact and secure peripheral attachment. The articular surfaces of the medial femoral condyle and medial tibial plateau were examined and probed. The articular surface of the medial

**SMG00171**

femoral condyle was found to be intact and within normal limits. An area of grade 1 to grade 2 chondral change was noted along the articular surface of the medial tibial plateau. Our attention then turned to the lateral compartment. The lateral meniscus was examined and probed. The lateral meniscus was found to be intact and within normal limits. There were no lateral meniscal tears noted. The lateral meniscus had an intact and secure peripheral attachment. The popliteus tendon and hiatus were within normal limits. The articular surfaces of the lateral femoral condyle arid lateral tibial plateau were examined and probed. The articular surface of the lateral femoral condyle was found to be intact and within normal limits. An area of grade 2 to grade 3 chondral injury was noted along the articular surface of the lateral tibial plateau. Our attention then turned to the patellofemoral articulation. Overall patellofemoral tracking was found to be within normal limits. There was no evidence of any significant plica formation. The articular surfaces of the patella and trochlea were examined, probed, and found to have areas of grade 1 to grade 2 chondral changes. The suprapatellar patellar pouch, medial and lateral gutters, intercondylar notch, and posterior capsular regions of the knee were examined and probed. There were no intra-articular loose bodies. There was no evidence of any significant intra-articular synovitis. There was no evidence of any significant intra-articular knee adhesions. The posterior cruciate ligament was examined and probed. The posterior cruciate ligament was found to be intact and within normal limits. The anterior cruciate ligament was examined and probed. Partial tearing of the anterior cruciate ligament was noted. The medial wall of the lateral femoral condyle was partially uncovered. Although some of the fibers of the anterior cruciate ligament were in continuity, they were found to be significantly attenuated with abnormal laxity and with abnormal orientation. The arthroscopic anterior drawer test was grossly positive. The arthroscopic anterior drawer test was grossly positive. Arthroscopic findings were consistent with the preoperative diagnosis of anterior cruciate ligament insufficiency. The patient was indicated for arthroscopically assisted anterior cruciate ligament reconstruction employing patellar tendon autograft. The dysfunctional remnant of the anterior cruciate ligament was debrided employing an arthroscopic suction shaver. All redundant soft tissues were debrided from the intercondylar notch employing the arthroscopic suction shaver. A standard notchplasty was carried out of the medial and superior walls of the lateral condyle employing the arthroscopic bur (minimal). Once an adequate notchplasty was accomplished, the knee was thoroughly irrigated of all bony and soft tissue debris. Our attention then turned to the harvesting of the patella tendon autograft. A standard anterior midline incision was then performed starting at the inferior pole of the patella and extending to just medial of the tibial tubercle. The dissection was continued through the subcutaneous tissues until the paratenon of the patellar tendon was identified. The pre-patellar bursal tissues were sharply excised. The paratenon of the patellar tendon was then incised in line with the skin incision exposing the length and width of the patellar tendon. The central one-third of the patellar tendon was harvested employing a double 10 mm scalpel blade. Bone blocks of identical width and approximately 21-24

SMG00172

mm in length were harvested from the patella and tibial tubercle, respectively, employing an oscillating saw and curved osteotome. A different surgical team then prepared the excised graft. The bone blocks were fashioned to enable smooth passage through 10 mm bone tunnels. The bone graft obtained from the preparation of the bone blocks was saved for later bone grafting of the patella harvest site. A drill hole was made in each end of each bone block through which a #2 suture was passed and fastened. The tendinous portion of the graft was cleaned of all redundant soft tissues. The tendinous portion of the graft was found to be of normal appearance, consistency, and texture. Once prepared, the graft was wrapped in a sponge moistened with normal saline. While the patellar tendon autograft was being prepared by a different surgical team, arthroscopic knee surgery was concurrently being performed. Under arthroscopic guidance, a tibial tunnel guide was positioned through the anteromedial portal and placed anterior to the posterior cruciate ligament in the region of the anatomic insertion of the anterior cruciate ligament (ACL) onto the tibial plateau. A guide wire was then drilled through the proximal tibia and into the knee joint at the above-mentioned point. The tibial tunnel guide was then removed, and a 10 mm cannulated drill was placed over the guide wire with which a tibial tunnel was drilled. The drill and the guide wire were both removed. Next, employing an anteromedial portal, a 7 mm anteromedial over the top guide was positioned in the region of the anatomic insertion of the ACL onto the distal femur. A flexible guide pin was drilled into the distal femur at this point. The over-the-top guide was removed. A cannulated and flexible 10 mm reamer was placed over the guide wire and an osseous femoral tunnel was drilled to the appropriate depth. The reamer was then removed. The edges of the bone tunnels were then smoothed employing a bone rasp. The knee was thoroughly irrigated of all bony and soft tissue debris. A looped suture was then attached to the islet of the flexible guide pin and pulled through the respective tunnels. At this point, the appropriate graft sutures were attached to the looped suture and pulled through the tunnels. Employing gentle traction and manipulation, the patellar tendon autograft was pulled until fully seated in both the tibial and femoral tunnels. Of note, the graft obtained an excellent fit, both in the bone of the distal femur as well as in the bone of the proximal tibia. Femoral fixation was carried out first. Femoral fixation was carried out employing a Stryker 8x25 mm metallic interference screw inserted employing standard technique and protocol. The screw obtained excellent purchase in the bone of the distal femur. The screwdriver and guide wire were then both removed. The knee was then taken through several ranges of motion to appropriately tension the graft. During this time, the graft was noted to be very isometric in its positioning. Next, with the knee in extension and appropriate tension placed on the tibial-sided graft sutures, as well as with a posterior drawer force being applied to the proximal tibia, tibial fixation was carried out employing Stryker 8x25 mm metallic interference screw, again inserted employing standard technique and protocol. This screw also obtained excellent purchase, this time in the bone of the proximal tibia. The screwdriver and guide wire were both removed. The graft sutures were removed. Arthroscopy of the

knee was re-performed. The ACL graft was noted to be under excellent tension, position, and orientation. The arthroscopic anterior drawer test was now negative. The tibial and femoral hardware were in good position. There was no evidence of graft impingement with dynamic range of motion testing of the knee under direct arthroscopic visualization. The knee was thoroughly irrigated and drained. The arthroscopic instrumentation was removed. The knee was then re-examined under anesthesia. There was excellent range of motion. There was no crepitus. The Lachman, anterior drawer, and pivot shift tests were now negative with no appreciable translation. At this point, wound closure was begun. The wounds were thoroughly irrigated with normal saline. The bone graft previously obtained was placed in the patellar harvest site and secured in place employing 0 Vicryl sutures. The patellar tendon harvest site was approximated employing interrupted 0 Vicryl sutures. The paratenon was closed employing interrupted 2-0 Vicryl sutures. The subcutaneous tissues were closed employing interrupted inverted 2-0 Vicryl sutures. The skin incisions were closed employing running 4-0 subcuticular Monocryl suture. A sterile dressing applied to the knee. The tourniquet was deflated and removed. The knee was then placed in a knee immobilizer. Anesthesia was reversed, and the patient was extubated. She was transferred to a stretcher and escorted to the recovery room in stable condition having tolerated the procedure well.

- Internal derangement;

- Post-surgical scarring;

- Effusion;

- Sprain/strain;

- Contusions;

- Loss of strength;

- Marked restriction in range of motion;

- Severe pain, swelling, and tenderness;

- Post-traumatic arthritis;

- Need for future surgery;

As a result of the foregoing Plaintiff suffers from severe pain, swelling and tenderness of the right knee resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

**LEFT SHOULDER**

- SLAP tear;

- Superior labrum tear;

- Internal derangement;

- Effusion;

- Sprain/strain;

- Marked restriction in range of motion;

- Posttraumatic arthritis;

- pine

- Numbness, tenderness, and tingling;

- Severe pain, swelling, and tenderness;

- Need for future surgery;

As a result of the foregoing Plaintiff suffers from severe pain, swelling and tenderness of the left shoulder resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

**LEFT HIP**

- Anterior labrum tear

- Internal derangement;

- Effusion;

- Sprain/strain;

- Marked restriction in range of motion;

- Posttraumatic arthritis;

- Numbness, tenderness, and tingling;

SMG00175

- Severe pain, swelling, and tenderness;

- Need for future surgery;

As a result of the foregoing Plaintiff suffers from severe pain, swelling and tenderness of the left hip resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

## LEFT KNEE

- Medial meniscus tear;

- Internal derangement;

- Effusion;

- Sprain/strain;

- Contusions;

- Loss of strength;

- Post-traumatic arthritis;

- Marked restriction in range of motion;

- Severe pain, swelling, and tenderness;

- Need for future surgery;

As a result of the foregoing Plaintiff suffers from severe pain, swelling and tenderness of the left knee resulting in loss of strength, loss of function, loss of motion, restriction of movement, all with involvement of the surrounding soft tissue, nerve endings, blood vessels, muscles, tendons and ligaments with resulting pain, deformity and disability.

The foregoing injuries directly affected the bones, tendons, tissues, muscles, ligaments, nerves, blood vessels and soft tissue in and about the involved areas and sympathetic and radiating pain from all of which Plaintiff suffered, still suffers, and may permanently suffer.

As a result of the accident and injuries herein sustained, Plaintiff suffered a severe shock to his nervous system. The foregoing injuries impaired the general health of Plaintiff. Plaintiff

SMG00176

verily believes that all of the injuries hereinabove sustained, with the exceptions of bruises and contusions are permanent and progressive in nature.

Plaintiff may permanently suffer from the aforesaid injuries and from its effects upon his nervous system and may limit his activities in his employment and his life. Plaintiff may be restricted in his normal life and activities and may permanently require medical and neurological care and attention.

11.      Plaintiff objects to Defendants' demands seeking the length of time that Plaintiff was confined to bed and home as a result of injuries sustained from the subject occurrence in sufficient detail as improper in that it seeks information that is evidentiary in nature and beyond the scope of a Bill of Particulars. However, without waiving said objections, Plaintiff has been confined to bed and home on an intermittent basis from the date of the subject occurrence, and upon information and belief, continues to be confined to bed and home on an intermittent basis to date and continuing.

12.      Plaintiff objects to Defendant's demand for the name, address and length of time that Plaintiff was confined to a hospital and the dates of admission and discharge as it is evidentiary in nature and/or beyond the scope of a Bill of Particulars. However, without waiving this objection, Plaintiff was "confined" to New Yok Presbyterian Hospital on July 15, 2022. See also, Plaintiff's Response to Combined Demands for authorizations for Plaintiff's medical records.

13.      Plaintiff objects to the demand to state the occupation of the Plaintiff and the name and address of the Plaintiff's employer at the time of the alleged accident and the Plaintiff's daily, weekly or monthly earnings as improper, evidentiary in nature and beyond the scope of a Bill of Particulars. However, without waiving this objection, Plaintiff was a laborer employed by EC

Interiors Remodeling Inc. located at 5841 Waldron Street, Corona, New York 11368. Plaintiff's weekly earning was approximately $1,100.00.

14. – 15. Plaintiff has been totally disabled since the date of the accident and continuing.

16.     Plaintiff is currently unaware of the total amount that will be claimed for special damages. However, without waiving the objection, the following is an estimation of those bills currently known to Plaintiff:

| | |
|---|---|
| (a) Physicians' services: | Included in (d); |
| (b) Medical Supplies: | Included in (d); |
| (c) Loss of earnings: | Approximated $180,000.00 and continuing; |
| (d) X-Rays: | Included in (d); |
| (e) Hospital expenses: | Estimated $700,000.00 and continuing; |
| (f) Nurses services: | Included in (d); |
| (g) Other: | Plaintiff is claiming past, present and future medical bills and past, present and future pain and suffering, amounts which will be determined by the trier of fact. |

It is anticipated that Plaintiff will require future treatment for the body parts alleged herein, including but not limited to:

> Epidural steroid injections, facet injections, physical therapy, chiropractic treatment, analgesics, MRI's, medications, pain management, surgery follow-ups, greater occipital nerve block injections, CAT scans, diagnostic studies, anesthesia, implants, trigger point injections, joint "lubrication" injections, surgery and revision surgery.

Cost of future medical treatment is estimated at: $6,500,000.00.

17.     Defendants violated Labor Law §§ 200, 240(1), and 241(6), and Industrial Code § 23-1.5, 23-1.21(b), 23-1.21 et seq.

18.    Plaintiff objects to Defendant's demand to set forth the names and addresses of witnesses to the subject occurrence or to the facts and circumstance surrounding it known to the Plaintiff, their attorney or their representatives as improper, evidentiary in nature and beyond the scope of a Bill of Particulars.

19. -. 24. Not applicable as the subject complaint does not allege property damage, personal property or damage to real property and/or furniture and fixture and/or equipment.

**PLEASE TAKE NOTICE,** that Plaintiff reserves the right to amend and/or supplement the above up to and including the time of trial.

**PLEASE TAKE FURTHER NOTICE,** that the plaintiff reserves the right to serve an amended and/or supplemental Bill of Particulars in connection with all claims including those of continuing special damages and disabilities.

Dated: New York, New York
      August 26, 2024

                    Yours, etc.,
                    **WILLIAM SCHWITZER & ASSOCIATES, P.C.**

                    Taylor B. Gablehouse, Esq.
                    *Attorneys for Plaintiff*
                    **ANDREA LISSETH ARMIJOS ABAD**
                    820 Second Avenue, 10th Floor
                    New York, New York 10017
                    (212) 683-3800
                    File No.: SMSC22-040
                    TGablehouse@wsatlaw.com

To:

MOLOD SPITZ & DeSANTIS, P.C.
*Attorneys for Third-Party Defendant*
**GRD SAFETY INC.**
1430 Broadway, 21st Floor
New York, New York 10018
(212) 869-3200

**SMG00179**

File No.: FTG-706
sdesantis@molodspitz.com

WOOD, SMITH, HENNING & BERMAN LLP
*Attorneys for Defendants*
**620 W 153 REALTY LLC and**
**ON STAR MANAGEMENT LLC**
685 Third Avenue, 18th Floor
New York, NY 10017
(212) 999-7103
File No.:10331-0219
TAbatemarco@wshblaw.com

GILBERT, MCGINNIS & LIFERIEDGE
*Attorneys for Third Party Defendant*
BATCO ASSOCIATES LLC
PO Box 6835
Scranton, Pennsylvania 18505-6840
(212) 487-9701
Email: brian.liferiedge@libertymutual.com

PILLINGER MILLER TARALLO LLP
*Attorneys for Third-Party Defendant*
CMG IMPROVEMENTS INC.
555 Taxter Road, Suite 500
Elmsford, New York 10523
(914) 703-6300
File No.: ASW-PROS-00265/ASW

SMG00180

## ATTORNEY VERIFICATION

STATE OF NEW YORK      }
                       } ss.:
COUNTY OF NEW YORK  }

I, Taylor B. Gablehouse, an attorney admitted to practice in the courts of New York State, state under penalty of perjury that I am associated with WILLIAM SCHWITZER & ASSOCIATES, P.C., the attorneys for the Plaintiff in the within action; I have read the foregoing **VERIFIED BILL OF PARTICULARS** and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe to be true. The reason this verification is made by me and not by my client, is that my client is not presently in the County where I maintain my offices. The grounds of my belief as to all matters not stated upon my own knowledge are the materials in my file and the investigations conducted by my office.

Dated: New York, New York
      August 26, 2024

Taylor B. Gablehouse, Esq.

<u>AFFIRMATION OF SERVICE</u>

STATE OF NEW YORK, COUNTY OF NEW YORK

     I, Oscar N. Ortiz Salguero, affirm this 2 7ᵗ day of August, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

     That I served the within **PLAINTIFF'S RESPONSES TO COMBINED DEMANDS** by depositing a true copy thereof enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State, addressed to each of the following persons at the last known address set forth after each name:

MOLOD SPITZ & DeSANTIS, P.C.
1430 Broadway, 21ˢᵗ Floor
New York, New York 10018

WOOD, SMITH, HENNING & BERMAN LLP
685 Third Avenue, 18th Floor
New York, NY 10017

GILBERT, MCGINNIS & LIFERIEDGE
PO Box 6835
Scranton, Pennsylvania 18505-6840

PILLINGER MILLER TARALLO LLP
555 Taxter Road, Suite 500
Elmsford, New York 10523

                                    Oscar N. Ortiz Salguero

SMG00182

**Index No.:** 520767/2022
## SUPREME COURT OF THE STATE OF NEW YORK
### COUNTY OF KINGS

ANDREA LISSETH ARMIJOS ABAD,

        Plaintiff,

    -against-

620 W 153 REALTY LLC and ON STAR MANAGEMENT LLC,

        Defendants.

**-AND OTHER ACTIONS-**

## VERIFIED BILL OF PARTICULARS

**WILLIAM SCHWITZER & ASSOCIATES, P.C.**
*Attorneys for Plaintiff*
**820 Second Avenue, 10th Floor**
**New York, New York 10017**
**(212) 683-3800**
**Fax: (212) 685-2356**

SMG00183